```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                        18 CR 419 (GHW)

 5   MARCOS ELIAS,
                                         Sentence
 6                  Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         July 25, 2019
 9                                       9:45 a.m.

10   Before:

11          HON. GREGORY H. WOODS

12                                       District Judge

13

14

15          APPEARANCES

16
     GEOFFREY S. BERMAN
17        United States Attorney for the
          Southern District of New York
18   SAGAR K. RAVI
          Assistant United States Attorney
19

20   ERIC J. SNYDER
     SAMIDH GUHA
21        Attorneys for Defendant

22
     Interpreter (Portuguese):  ALEX LADD
23

24   Also Present:  JOE STRAWMAN – Special Agent FBI
                     CAROLYN LEFEVER – Paralegal, U.S. Attorney
25
```

1                    (Case called)

2                    THE CLERK:  Counsel please state your names for the

3       record.

4                    MR. RAVI:  Good morning, your Honor.  Sagar Ravi for

5       the United States.  I'm joined at counsel table by Special

6       Agent Joseph Strawman of the FBI and Carolyn Lefever, a

7       paralegal in our office.

8                    THE COURT:  Thank you very much.  Good morning.

9                    MR. SNYDER:  Good morning, your Honor.  For Mr. Elias,

10      Eric Snyder and Samidh Guha from Jones Day.

11                   THE COURT:  Thank you very much.  I'm sorry for

12      starting late this morning.  Thank you for your patience.

13                   We are here to conduct a sentencing hearing for Mr.

14      Marcos Elias.  Let me note for the record that we are using the

15      services of an interpreter here today.  Mr. Elias please let me

16      know if you have any difficulty hearing or understanding

17      anything that is said by the interpreter here.

18                   I have received and reviewed the following materials

19      in connection with this sentencing:

20                   First, the pre-sentence report, which is dated March

21      28, 2019;

22                   Second, the defendant's sentencing memorandum, which

23      is dated April 11, 2019, together with its exhibits;

24                   Third, the government's sentencing memorandum, which

25      is dated April 18, 2019;

1            Fourth, the letter from the victim witness coordinator

2     of the United States Attorney's office for the Southern

3     District of New York, which is dated April 19, 2019, and the

4     attached victim statement;

5            Fifth, the letter from defendant with respect to

6     issues raised for a <u>Fatico</u> hearing dated as of June 29, 2019,

7     together with its exhibits;

8            Sixth, the government's letter with respect to issues

9     raised for our Fatico hearing dated as of June 29, 2019;

10           Seventh, the letter from defendant with respect to

11    issues raised from the Fatico hearing which is dated as of July

12    1, 2019, together with its exhibits;

13           Eighth, the defendant's supplemental sentencing

14    memorandum which is dated July 11, 2019, together with its

15    exhibits; and

16           Ninth, the government's supplemental sentencing

17    memorandum, which is dated July 18, 2019;

18           Tenth, the defendant's supplemental sentencing

19    submission which is dated July 24, 2019, together with its

20    exhibits, which consist of financial statements by the

21    defendant not previously provided to the probation office.

22           Counsel, have each of the parties received all of

23    those materials?

24           MR. SNYDER:  Yes, your Honor.

25           MR. RAVI:  Yes, your Honor.

1          THE COURT:  Thank you.  Have each of the sentencing

2   memoranda been filed with the clerk of the court?  I would like

3   to ask in particular with respect to this question what the

4   basis is for the requests that I see in the defendant's

5   supplemental sentencing memorandum under seal.  First, counsel

6   for the United States, have the government's sentencing

7   memoranda been filed with the clerk of the court?

8          MR. RAVI:  Yes, your Honor.  They were filed

9   electronically.

10         THE COURT:  Good.  Thank you.

11         Counsel for defendant, but for the supplemental

12   sentencing memorandum, your sentencing memoranda have been

13   filed on the docket, as I understand it.  What is the basis for

14   the request that I file under seal the defendant's supplemental

15   sentencing memorandum?

16         MR. SNYDER:  It was to protect the cooperator, your

17   Honor.  It was our practice, is our practice, that we don't

18   want to reveal anything that could put a cooperating witness

19   with the government in any kind of harm or danger.

20         THE COURT:  Is he a cooperating witness?

21         MR. SNYDER:  Mr. Evandro dos Reis.

22         THE COURT:  Understood.  I will grant the request for

23   that reason, which I think is adequate justification for me to

24   provide the request to file that material under seal.

25         Let me turn first to counsel for the United States.

1    Are there any other submissions in connection with this

2    sentencing?

3              MR. RAVI:  No, your Honor.

4              THE COURT:  Counsel for defendant, are there any other

5    additional submissions in connection with the sentencing?

6              MR. SNYDER:  No, your Honor.

7              THE COURT:  Thank you.  Counsel for defendant, let me

8    turn to you.  Have you read the pre-sentence report?

9              MR. SNYDER:  Yes, your Honor.

10             THE COURT:  Have you discussed it with your client?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Mr. Elias, let me turn to you.  You can

13   remain seated until I ask you to stand.  That's fine.  Mr.

14   Elias, have you read the pre-sentence report?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  Have you discussed it with your counsel?

17             THE DEFENDANT:  Yes, I did.

18             THE COURT:  Have you had the opportunity to review

19   with your counsel whether there are any errors in the

20   pre-sentence report or whether there were any other issues with

21   the pre-sentence report that should be addressed by the Court?

22             THE DEFENDANT:  Yes, I had the opportunity.

23             THE COURT:  Let me turn to counsel for the United

24   States.  Counsel for the United States, have you read the

25   pre-sentence report?

1            MR. RAVI:  Yes.

2            THE COURT:  Do you have any objections related to the

3     factual accuracy of the pre-sentence report?

4            MR. RAVI:  No, your Honor.

5            THE COURT:  Thank you.

6            Counsel for defendant, do you have any objections

7     related to the factual accuracy of the pre-sentence report?

8            MR. SNYDER:  No, your Honor.

9            THE COURT:  Thank you.  Given that there are no

10    objections to the factual recitations in the pre-sentence

11    report, the Court adopts the factual recitations in the

12    pre-sentence report.  The pre-sentence report will be made part

13    of the record in this matter and will be placed under seal.  If

14    an appeal is taken, counsel on appeal may have access to the

15    sealed report without further application to the Court.

16            Although district courts are no longer required to

17    follow the advisory sentencing guidelines, we are still

18    required to consider the applicable guidelines in imposing

19    sentence.  To do so, it is necessary that we accurately

20    calculate the advisory sentencing guidelines range.

21            In this case the defendant pleaded guilty to Counts

22    One and Four of the superseding indictment in this case.  Count

23    One charged him with conspiracy to commit bank fraud in

24    violation of 18 U.S.C. section 1349.  Count Four charged him

25    with aggravated identity theft in violation of 18 U.S.C.

1   section 1028A(a)(1), 1028A(b), and 2.

2          Counsel for the United States, does the government

3   agree that a 2-level adjustment is appropriate here, under

4   section 3E1.1A?

5          MR. SNYDER:  Yes, your Honor.

6          THE COURT:  Is the government moving for an additional

7   1-level adjustment under section 3E1.1(d)?

8          MR. RAVI:  Yes, your Honor, on the basis that the

9   defendant assisted in the prosecution of his own misconduct by

10  timely notifying the government of his intention to enter a

11  guilty plea.

12         THE COURT:  Thank you.  I calculate the sentencing

13  guidelines in a manner consistent with the plea agreement in

14  the pre-sentence report.  The applicable Sentencing Guidelines

15  Manual is the November 1, 2018, Sentencing Guidelines Manual

16  incorporating all guidelines amendments.

17         The guidelines sentence for Count Four is the minimum

18  term of imprisonment required by statute.  Therefore, I do not

19  consider it separately in the guidelines calculation.

20         Pursuant to section 2B1.1A, the base level for the

21  offense charged in Count One is 7.  Because the loss reasonably

22  foreseeable to the defendant was greater than $550,000 but not

23  more than $1,500,000, 14 levels are added to the base level

24  pursuant to section 2B1.1(d)(1)(H).

25         Because a substantial part of the fraudulent scheme

was committed from outside of the United States and the offense

otherwise involved sophisticated means, and the defendant

intentionally engaged in or caused the conduct constituting

sophisticated means, 2 offense levels are added pursuant to

section 2B1.1(d)(10)(B) and (C).  Because the defendant has

demonstrated acceptance of responsibility for his offense

through plea allocution, apply a 2-level reduction pursuant to

section 3E1.1(a).  Upon motion by the United States, an

additional 1-level reduction is warranted under section

3E1.1(b).

As a result, the applicable guidelines offense level

for the offense charged in Count One is 20.

The defendant has no criminal history points.  As a

result, the defendant is in criminal history category I.

I have considered whether there is an appropriate

basis for departure within the guidelines system.  While I

recognize that I have the authority to depart, I do not find

any grounds warranting a departure under the guidelines.  In

sum, I find that the offense level for Count One is 20 and that

the defendant's criminal history category is I.  Therefore, the

guidelines range for Count One is 33 to 41 months of

imprisonment.  The guidelines range for Count Four is 24

months' imprisonment.

Does either party have any objections to the sentence

guidelines calculation?

1                MR. RAVI:  No, your Honor.

2                MR. SNYDER:  No, your Honor.

3                THE COURT:  Thank you.

4           Let me turn to counsel for defendant.  Counsel, do you

5      wish to make a statement with respect to sentencing?

6                MR. SNYDER:  I do, your Honor.

7                THE COURT:  Please proceed.

8                MR. SNYDER:  Your Honor, at the outset, the defendant

9      and the government agree that the argument here today applies

10     only to Count One, and to Count One in a vacuum.  There are two

11     bases for your Honor to apply a downward variance in the

12     sentence, a nonguidelines sentence, and both are legally

13     cognizable.  First is the family hardship factors.  Next is the

14     acceptance of responsibility and cooperation with the

15     government by Marcos Elias.

16          First his family issues, your Honor.  Mr. Elias has

17     three sons all under the age of 13.  As your Honor can see from

18     the letters that have been submitted from his sons, his

19     ex-wife, and his friends and family in Brazil, Mr. Elias has

20     been a very important presence in the life of his sons.

21          One of his sons, his middle son, your Honor, has

22     autism, is on the autism spectrum, has special needs.  It seems

23     from the reading of this, the letters that were submitted, that

24     Mr. Elias is potentially uniquely capable of helping his middle

25     son struggle with this disability.

1          Any sentence that is imposed by your Honor is

2    extremely burdensome to these boys in that they don't have the

3    ability to visit with their dad, to see their dad, and can only

4    have very minimal contact through phone calls with their father

5    while he serves a sentence in the United States.

6          On the second basis that your Honor has to vary

7    downward, Mr. Elias, in what is unique and extraordinary and

8    not likely to come before the Court again in this matter, Mr.

9    Elias, after he pled guilty and after he learned about the

10   government's view of the facts here, offered to meet with the

11   government, to be interviewed by the U.S. Attorney and the FBI,

12   without any protection, offered to correct the facts that they

13   had, correct their understanding of what had happened.

14         He did so without any protection.  There was no

15   proffer letter.  There was no protection for him.  He also

16   didn't understand or have any basis to believe he could benefit

17   from this.  And he had no reason to be dishonest.  In fact, he

18   was truthful throughout what was a four-hour meeting with the

19   FBI in the U.S. Attorneys on May 2nd of this year.

20         The government recognized that this was rather

21   unprecedented and they accepted it as a gesture of good faith,

22   that he was willing to come in without any protection.  They

23   listened to him for four hours.  And after that meeting, on May

24   3rd, the following day, they confronted Mr. dos Reis, Evandro

25   dos Reis, for the first time.  From a review of everything,

1    they confronted him for the first time about whether he had

2    received any of these proceeds.

3         So not only did Mr. Elias cooperate without any

4    protection and provide information to the government, the

5    government used that information and they used it to confront

6    their cooperator, and now it's changed their understanding of

7    the facts.

8         Your Honor, we heard you loud and clear on July 2nd

9    that you do not need to resolve any factual issues to sentence

10   Mr. Elias.  We understand the Court and we take the Court's

11   direction.  But with the Court's indulgence, if I can walk

12   through some of his cooperation efforts.  While the facts of

13   what he said are not necessary for your Honor to resolve, there

14   are facts that are not in dispute that your Honor can consider

15   in applying a downward variance.

16        He offered to be interviewed by the government

17   post-plea.  He did so with no protection and no reason to

18   convey information that was not true.  The government

19   acknowledged that this was highly unusual and unprecedented.

20   Then Marcos Elias authorized myself and Mr. Guha to be fully

21   transparent with the government regarding our investigation and

22   diligence in reviewing all the material that we received from

23   the government in preparation for what would be a Fatico

24   hearing.

25        The government benefited from our review, our

1    diligence, in identifying certain documents that were

2    corroborating Mr. Elias's account, such as that he gave money

3    to Mr. dos Reis.  We provided an email that corroborated what

4    Mr. Elias said, and they used that as well to confront Mr. dos

5    Reis, using not just the words in the proffer of our client,

6    but while they had them in their possession and say they have

7    reviewed it, they didn't identify the key documents about that

8    one fact in particular, just for example.  They have now used

9    that information to correct their representation to the Court

10   that they made in their April 18th submission.

11        Those two bases your Honor can use to apply a downward

12   variance from the guidelines sentence.  We would ask you to do

13   it on those bases as well as the fact that Mr. Elias is not a

14   citizen and, because of his immigration status, will serve in a

15   much more difficult environment any sentence that your Honor

16   imposes.

17        Quite frankly, he won't be eligible for a prison camp

18   that he would have been eligible for if he had status in this

19   country.  So, instead of serving in a prison camp, a fenceless

20   environment, he is now going to serve in a very much increased

21   high-security setting, which involves searches and lockdowns

22   and double razor wire fences.  He is even potentially going to

23   serve in a private prison facility, which brings other

24   hardships to the inmates of those facilities.  Then he is going

25   to serve additional time even after completing any sentence

1    your Honor imposes.

2         What we are asking for is on Count One that your Honor

3    take into account his cooperation, which you can under

4    Fernandez absolutely, and apply it in any way you deem

5    appropriate, and to sentence Mr. Elias to probation on Count

6    One.  And then, as the law demands, to give him the appropriate

7    sentence on Count Four.

8         Thank you, your Honor.

9         THE COURT:  Thank you.

10        Let me turn to Mr. Elias.  Mr. Elias, do you wish to

11   make a statement to the Court?

12        THE DEFENDANT:  May I?  I want.

13        THE COURT:  Please proceed if you would like.  You can

14   speak in Portuguese and the interpreter will translate your

15   words.  Proceed as you feel most comfortable.

16        THE DEFENDANT:  I just want to say that I'm sorry,

17   that I apologize to my family, to the Court, to the victims of

18   the conduct.  While Evandro and I thought it was a victimless

19   crime at the time, I understand it was no less wrong.  No

20   amount of money is worth the separation from my family.  I have

21   endured and I will endure to the completion of my sentence.

22   More than anything, I want to complete my sentence and return

23   to my family and live a lawful, productive life to make up for

24   the time I have missed them.

25        Just this.

1              THE COURT:  Thank you very much.

2              Counsel for the United States, does the government

3    wish to be heard with respect to sentencing?

4              MR. RAVI:  Yes, your Honor.

5              THE COURT:  Thank you.  Please proceed.

6              MR. RAVI:  Your Honor, the government agrees with the

7    probation department here that a significant term of

8    imprisonment within the guidelines range is appropriate.

9    Actually, to quote the probation department, they said it was

10   "warranted and justified."  Probation also agreed that there do

11   not appear to be any factors which would warrant a sentence

12   outside of the guidelines range.

13             I would like to respond to a couple of arguments

14   relating to the nature and circumstances of the offense that

15   were made in the sentencing submissions to emphasize a few

16   points.

17             The defendant in their submissions has sought to

18   portray Mr. Elias's crime as a lapse of judgment, that it was

19   aberrational.  But this case is tragic in many ways because the

20   defendant here had the benefits of studying at Brazil's most

21   prestigious institutions.  He had achieved financial success at

22   a number of well-known financial institutions.  He had managed

23   the assets of some of the Brazil's wealthiest families, and he

24   had the privilege to live in one of the most high-class

25   neighborhoods in Sao Paolo Brazil.

1        But despite all of this, the defendant decided to

2   commit multiple acts of fraud over an extended period of time

3   in 2014.  This was no lapse of judgment.  It was greed.  It's

4   as simple as that.

5        Looking at the sentencing factors, and specifically

6   the nature and circumstances of the offense, the seriousness of

7   the offense, and the need for judgment, the defendant was

8   involved in all aspects of this fraud, from the beginning

9   through the end.

10        He registered two fake email accounts in the victim's

11   name.  He registered a domain name that appeared to be looking

12   like the company's name in order to make it appear more

13   legitimate.  He directed the creation of a Panama company in

14   order to open a Luxembourg bank account to receive the

15   fraudulent funds.  He forged two sets of wire instructions

16   using the victim's signature and the logo of the company, and

17   then he invested and laundered that money in Luxembourg back to

18   where he was in Brazil.

19        Despite all that, he also took steps to hide his

20   tracks.  When the fraud was developed and it was disclosed that

21   it was known, the defendant closed the Luxembourg account,

22   dissolved the Panama company, and deleted his email account

23   before the government could get a search warrant on it.  When

24   we received the return, it said the account was deleted.

25        This was no simple scheme or single mistake.  It

involved multiple sophisticated acts of identity fraud,

including the creation of shell companies and email domains,

all to facilitate the fraud.

Then, despite succeeding in stealing three-quarters of

a million dollars, the defendant did not stop his criminal

conduct and continued with it.  About five months after he was

successful at stealing the $750,000, the defendant attempted to

steal even more money by targeting accounts at a second

financial institution, using the names of the victim as well as

members of the victim's family.  He continued to forge

documents and also conducted multiple acts of identity theft

there.

The defendant only pled guilty to one count of

identity theft.  So the record is clear, there were multiple

counts of identity theft to which he could have been found

guilty.

Perhaps most importantly, your Honor, the defendant

was the primary, if not the sole, beneficiary of this fraud.

Turning a little bit to the history and

characteristics of this defendant, the government does not

doubt the letters of support that the defendant has received

from friends and family relating to the good acts that he has

done.  But defense counsel has emphasized throughout their

submissions that the defendant committed this crime out of

desperate need to support his family.

          Considering the history and the characteristics of
this defendant, the Court should also consider the fact that
the defendant committed this crime despite, as is undisputed in
the PSR, he was earning at least six figures in the years
leading up to the fraud.  He had sold a company in the year
that the fraud occurred.  He was also living in a house that
was worth well over a million dollars at the time that this
fraud occurred.  That is reflected in the financial affidavits
that were submitted yesterday.

          It is also important to note that when the defendant
stole this money and got it into the account at Luxembourg, he
didn't immediately transfer and spend it on what appeared to be
necessary expenses for his family.  That money was invested.
It wasn't transferred out until May of 2015, approximately 11
months after the fraud had occurred.  So this is not a case
about someone stealing a modest sum of money in order to help
the family.  Mr. Elias stole $750,000 and tried to steal even
more money.

          Finally, your Honor, with respect to the points of
general deterrence and the need to promote respect for the law,
the government cannot overemphasize the importance of those
factors here given the pervasiveness of identity theft, which
causes not only great financial harm to victims like those
here, but, as the Court saw in the victim impact stated, it
also eroded some of the trust in the financial institution that

1    was a victim here as well.

2            I believe the Court should consider all of those

3    factors.

4            Now turning to the defendant's two kind of reasons for

5    a downward variance.  With respect to the purported cooperation

6    that the defendant is seeking to get credit for, just as the

7    defendant has no right to a cooperation agreement from the

8    government, the Second Circuit made clear in Fernandez that a

9    defendant is not entitled to any credit from the court for any

10   cooperation or attempted cooperation.  It's up to the Court's

11   discretion.

12           If you look at all the non-Second Circuit cases cited

13   by the defendant in his submission where there was a discussion

14   of how the court considered the cooperation that was proffered

15   by the defendant, each of those lower courts declined to grant

16   a below-guidelines variance based on the defendant's proffered

17   cooperation.

18           There should be no credit here, your Honor.  I think

19   the Court has already recognized as much through its comments

20   at the Fatico hearing that it is not apparent that a

21   cooperation agreement would be warranted under these

22   circumstances, and for really two reasons that I think are most

23   important.

24           First, the defendant did not provide any new material

25   information to the government that it could use to determine

1   whether or not Mr. dos Reis had violated his cooperation

2   agreement by making false statements.  Defense counsel makes

3   reference to the fact that the government confronted Mr. dos

4   Reis regarding information that Mr. Elias had proffered as well

5   as certain documents.

6          To be clear, your Honor, all those documents that

7   defense counsel had said he gave to the government, those were

8   documents the government already had in its possession and had

9   already reviewed them.  It is entirely a normal process for the

10  government to confront a cooperating witness when there are

11  allegations that they made false statements regarding anything

12  in the record.

13         Defense counsel also indicated that his purported

14  cooperation somehow changed the government's view of the facts

15  here or that it caused the government to correct the record

16  with respect to any issue.  I, frankly, am not quite clear what

17  defense counsel is referring to, your Honor.  It looked like he

18  was referring to the fact that Mr. Elias had said that Mr. dos

19  Reis received proceeds of this fraud.  The government has yet

20  to find corroboration for the fact that Mr. dos Reis received

21  fraud proceeds as part of his compensation for facilitating

22  this fraud.

23         In fact, in the document that the defendant attached

24  to his supplemental sentencing submission, in that email it

25  shows that the 13,000 that Mr. Elias is referring to is

1      actually relating to a crowd funding investment.

2            Your Honor, I have another email here as well that I

3      would like to present to the Court, since this seems to be an

4      issue.  I already gave defense counsel a copy of it.

5      Government Exhibit 55 is what it was marked as for the Fatico

6      hearing.

7            If you look at the English translation of this

8      document, on page 3 there is an email from Marcos Elias on

9      September 23, 2014, where he writes to Mr. dos Reis pursuant to

10     the English translation, "Would you be able to find a way to do

11     the accounting of the USD 13,000 that I gave to you as

12     pre-operational expenses for the crowd funding project?"

13           Your Honor, we of course continue to confront a

14     cooperator, as the government always does, like it did in this

15     case, especially since there was a Fatico hearing that the

16     government wanted to prepare for.  But Mr. dos Reis in his

17     first substantial proffer back in October 2015 discussed the

18     fact that he received some money from Marcos Elias after the

19     fraud and that it was for a crowd funding investment.  The

20     dispute is whether or not Mr. dos Reis received money as

21     proceeds of fraud as compensation for his involvement in the

22     fraud.  There has been no corroboration of Mr. Elias's account

23     on that.

24           The second reason the Court should not provide any

25     cooperation credit here is, based on the government's

submission, the government has not credited Mr. Elias in large

part because there is not corroboration for his account here.

The government provided some examples in its sentencing

submission for the Court to consider.

For all those reasons, your Honor, the government

submits that the probation department's recommendation here of

a guidelines sentence on Count One is appropriate and

sufficient but not greater than necessary to achieve the

purposes of sentencing.

THE COURT:  Thank you.

I'll give the defense the opportunity to make any

arguments in rebuttal if you would like.  First, I'm marking

the document that the government has handed to me as Court

Exhibit A for purposes of this proceeding.  It is a series of

emails marked as Government Exhibit 55, with an English

translation of the emails attached as Exhibit 55A.

Counsel for defendant, is there anything you would

like to say relating to the government's remarks?

MR. SNYDER:  Yes.

THE COURT:  Please proceed.

MR. SNYDER:  Your Honor, first, as to the argument

that it was greed, Mr. Elias was very generous with the church.

The lion's share of the money he had went to prepay tuition at

the religious school for his boys, which was suffering from

financial difficulties.  He prepaid their tuition for a number

of years.

When he engaged in this, he was struggling financially.  He admits fully it was absolutely wrong.  He takes full responsibility for that.  But it is not greed.  It was foolishness in giving money that he shouldn't have been giving to his church and to his children's school and to other causes that he was committed to.

As to the second argument, though, your Honor, this has nothing to do with a 5K1 letter.  We are not arguing the facts here, your Honor.  Your Honor made that clear.  We do not have to argue resolved facts here.  If the government chose to give him a 5K1 letter, we would not be having this discussion today.

What Fernandez says, and Fernandez is exactly on point here, is that your Honor may consider such cooperation efforts by Mr. Elias in imposing a variance.  Mr. Sagar wrote to your Honor on April 18, "It is not in dispute that every penny of the over $750,000 stolen from the company went to Elias."  He then went on to say, "The cooperating witness," Mr. dos Reis, "did not receive any of the fraud proceeds."  He said that on April 18th.

That's what brought us to the whole Fatico issue.  We asked him to correct that statement.  We told him it was not accurate.  We brought in Mr. Elias to explain to him that he, Mr. Elias, gave 15,000 in U.S. cash in an envelope to dos Reis.

1    Although they had this material, your Honor, they just hadn't

2    noticed the relevant emails.

3         We then went through all this 3500 material four years

4    after they started the investigation.  We identified these

5    emails to show and corroborate that Mr. Elias was telling the

6    truth.  We gave them those emails from our diligence, diligence

7    that they didn't put into reviewing this material.  It was

8    then, first on May 3rd, after talking to Mr. Elias, and then

9    subsequently, after we gave them these documents, that they

10   confronted dos Reis about the money and dos Reis admitted to

11   receiving the money from Mr. Elias.

12        It doesn't matter, your Honor, what the government

13   chooses to believe.  It doesn't matter if they want to say that

14   the money that dos Reis received in an envelope in Sao Paolo

15   was not the proceeds.  Frankly, we are not here to argue that.

16        What we are trying to ask your Honor to do is to

17   recognize that cooperation, to recognize that the government

18   used his cooperation, used the documents we gave them to --

19   maybe they haven't corrected the record -- to change what they

20   know about whether or not Mr. dos Reis received money from this

21   fraud.

22        Your Honor can recognize that cooperation and apply a

23   variance not just for the cooperation's sake and how it may

24   have helped the government and the Court perhaps to understand

25   the facts better, but it also goes to his remorse.  It goes to

1    Elias's rehabilitation, that he has come forth taking full

2    responsibility and was willing to sit and tell the government

3    where they had it wrong and, frankly, came in on July 2nd, your

4    Honor, prepared to testify to the Court about that.

5            I think your Honor can consider that and should

6    consider it under Fernandez.  What you want to do with it is up

7    to you, but you are certainly permitted to consider that.

8    Thank you, your Honor.

9            THE COURT:  Thank you very much.

10           Is there any reason why sentence should not be imposed

11   at this time?

12           MR. RAVI:  No, your Honor.

13           MR. SNYDER:  No, your Honor.

14           THE COURT:  Thank you.  I will now describe the

15   sentence that I intend to impose.  Counsel will have a final

16   opportunity to make legal objections before the sentence is

17   finally imposed.

18           As I have stated, the guidelines range applicable to

19   Count One is 33 to 41 months of imprisonment.  The guidelines

20   sentence for Count Four is 24 months, which must run

21   consecutive to any other sentence that I impose.  As counsel

22   has recognized, the Court may not consider the mandatory

23   minimum sentence for Count Four when determining the

24   appropriate sentence with respect to Count One.

25           I have considered the guidelines range and sentence in

1    this matter.

2           Under the Supreme Court's decision in Booker and its

3    progeny, the guidelines range is only one factor that I must

4    consider in deciding the appropriate sentence.  I'm also

5    required to consider the other factors set forth in 18 U.S.C.

6    section 3553(a).  These include:

7           First, the nature and circumstances of the offense and

8    the history and characteristics of the defendant;

9           Second, the need for the sentence imposed to (a)

10   reflect the seriousness of the offense, to promote respect for

11   the law, and to provide a just punishment for the offense, (b)

12   to afford adequate deterrence to criminal conduct, (c) to

13   protect the public from further crimes of the defendant, and

14   (d) to provide the defendant with needed education or

15   vocational training, medical care, or other correctional

16   treatment in the most effective manner;

17          Third, the kinds of sentences available;

18          Fourth, the guidelines range;

19          Fifth, any pertinent policy statement;

20          Sixth, the need to avoid unwarranted sentence

21   disparities among defendants with similar records who have been

22   found guilty of similar conduct; and

23          Seventh, the need to provide restitution to any

24   victims of the offense.

25          Ultimately, I am required to impose a sentence that is

sufficient but not greater than necessary to comply with the

purposes of sentencing that I mentioned a moment ago.

I have given substantial thought and attention to the

appropriate sentence in this case, considering all of the 3553

factors and the purposes of sentencing as reflected in the

statute.  Based on a review of all of those factors, which I

will discuss in more detail in a moment, I intend to impose a

nonguidelines sentence of 18 months of incarceration for Count

One and 24 months of incarceration for Count Four, with each of

those terms to be served consecutively.

The term of incarceration will be followed by 2 years

of supervised release.  I do not expect to impose a fine.  I

expect to order restitution.  I will impose the mandatory fee

of $100 for each of the crimes of conviction.  I am going to

discuss each of those issues with more specificity after I

review my reasoning.

Let me begin with the nature of the offense.  Mr.

Elias's crime was very serious.  He conspired to steal over

three-quarters of a million dollars and worked over a period of

time to implement a sophisticated scheme to defraud his victim.

Mr. Elias's co-conspirator, Mr. dos Reis, sent Mr. Elias

confidential information regarding an inactive account held by

Companhia Zaffari Comercio e Industria using his personal email

account.

Shortly thereafter, an individual falsely claiming to

be an employee of Zaffari sent Mr. dos Reis instructions on

Zaffari letterhead with Paul Hanat's forged signature to

transfer funds from the Jeffries account to an account in the

name of Carroll Gardens.

When that request was rejected because the recipient

account did not have the Zaffari name in it, an individual

falsely claiming to be a Zaffarian employee sent Mr. dos Reis's

instructions on Safari letterhead directing that the funds be

sent to an account in the name of Zaffari Com. Ind. Corp. at a

different bank.  That wire went through.

Two weeks after Zaffari notified Jeffries of the

fraud, Mr. Elias requested that the account to which the funds

had been transferred be closed and that the funds be

transferred to other accounts.

Mr. Elias's fraud did not end with the Jeffries

account.  Perhaps inspired by that opportunity, Mr. Elias later

sent Mr. dos Reis an email with the names of accounts that he

believed the Zaffari family held at Morgan Stanley.  Mr. Elias

then provided a retired NYPD officer working with the pair

forged a power of attorney purporting to be from another member

of the Zaffari family.

So, Mr. Elias's crimes were very serious.  They

involved the theft of over three-quarters of a million dollars.

They were sophisticated, involving the creation of false bank

accounts internationally, the forgery of documents, and

identity theft.  This is a very serious offense, and I believe
the sentence must take the seriousness of his offense into
effect and to punish him for it.

Mr. Elias is 48 years old.  He was born in Sao Paolo
in Brazil in May 1971.  He has had in many ways many benefits.
Mr. Elias had a good childhood in middle class conditions.  His
father was a salesman while his mother stayed home.  When he
was 17 Mr. Elias's father lost his job, which led to a period
of what I understand to be stress and abuse.  It also led Mr.
Elias to find his first job, if I recall correctly, as a tutor.

I have read all the letters that have been submitted
to me on Mr. Elias's behalf.  It is clear that Mr. Elias has
many important and powerful relationships, that his siblings
are still close to him, that his mother is still living.
Sadly, his father passed away too soon from a heart attack.

Mr. Elias, while divorced from his wife after an
18-year marriage in 2018, still has strong support.  And he has
three children who were 11, 9, and 5 at the time the PSR was
prepared.  I recognize that he is an important, very important,
part of their lives, particularly of the life of his middle
son.

Mr. Elias is currently in a committed relationship
with his partner.  I have read all the many letters submitted
on behalf of Mr. Elias, and I recognize the many good things
that he has done.  I know from them that Mr. Elias is much

loved and supported by his friends and family and that he has worked to have a positive impact on many.

So, in many ways Mr. Elias comes to me with many benefits that many people who sit before me for sentencing do not.  Yet despite those, he is here for stealing three-quarters of a million dollars.

Mr. Elias lived nearly his entire life in Brazil and has essentially no ties to the United States apart from his MBA, which I will speak about momentarily.  A detainer has been issued against him by ICE.  Mr. Elias is blessed with good physical health.  He suffered from anxiety for the past ten years or so and has been treated for the condition by a psychiatrist, who has prescribed medication to treat his symptoms.  Mr. Elias has no reported history of substance abuse issues.

Mr. Elias's life has been a picture of success in many ways.  He has a college degree in mechanical engineering, an MBA from the University of Pittsburgh.  He took Ph.D classes in math in Brazil but did not complete his thesis.

He has held a series of significant positions in the financial industry which have made him relatively well to do.  He ran a research firm from 2009 to 2014.  He ultimately sold that business to Agora.  From 2014 to 2016 he owned and operated a money management company called Guiar Investments.  From 2016 to 2018 he operated an asset management company

1  called Mobena Capital.

2          Mr. Elias reported that he earned only $150,000 a year

3  in the first of those jobs and that he earned $100,000 a year

4  at his last two firms.  That is what he has reported.  As

5  noted, Mr. Elias has only recently provided the Court with his

6  financial information, which suggests that he has very limited

7  assets at this point.

8          Mr. Elias has no prior convictions for criminal

9  conduct.

10          I believe that an important sentence, a meaningful

11  sentence, is important in this case in order to impose a just

12  punishment.  I am required to consider the deterrent effect

13  both on Mr. Elias personally and also the need for general

14  deterrence, to impose a sentence that will prevent orders from

15  committing similar offenses.

16          Unfortunately, I believe that there is some real risk

17  that Mr. Elias will be tempted to recidivate.  I recognize that

18  in some ways this may have been a crime of opportunity that was

19  seized after Mr. dos Reis made the Zaffari information

20  available.  But once engaged in the crime, Mr. Elias went all

21  in, developing a sophisticated infrastructure to implement his

22  crime and looking for opportunities to do still more.

23          I understand that Mr. Elias ultimately committed this

24  crime out of what his counsel has characterized as financial

25  motivation.  Whether that is distinct from pure greed is less

1    clear to me.

2         I fear ultimately that whatever financial motivation

3    it was that may have led him to this crime will persist after

4    he is released.  The pressure may be greater if his clients and

5    his financial advisory business look unfavorably on his

6    willingness to lie, falsify documents, and to secrete money in

7    foreign accounts.

8         There are a number of factors that I hope would reduce

9    the risks of recidivism here, including his maturity, his

10   commitment to his children and family, and his education and

11   professional history.  Unfortunately, all of those factors

12   existed at the time that Mr. Elias decided despite those things

13   to steal money to meet financial obligations that he wanted to

14   fulfill.

15        I recognize too that Mr. Elias is likely to be

16   deported following this offense, but I cannot ignore in this

17   calculus the fact that Mr. Elias was physically located in

18   Brazil when he committed this crime.  So I believe that there

19   is some need for personal deterrence in this case.  I am also

20   required to consider the goal of general deterrence.  I hope

21   that by imposing this meaningful sentence it will dissuade

22   orders from committing the offense.

23        I have considered Mr. Elias's ability to use the

24   period of incarceration for educational and vocational

25   training, medical care, and other correctional treatment in the

most effective manner.  Given Mr. Elias education, job history,
and health, I believe that this factor weighs against a longer
incarceratory sentence.

        I have considered the kinds of sentences available.  I
believe that a sentence with a meaningful term of imprisonment
is appropriate.  I have given serious consideration to the
guidelines and the policy statements.  I believe that a
nonguidelines sentence is appropriate in this case with respect
to Count One.  My determination rests on a balancing of all of
the purposes of sentencing based on my assessment of the facts
that are before me as set forth in 18 U.S.C. section 3553.

        I would like to highlight just a handful of the
reasons that drive my downward variance here.

        First, I recognize that Mr. Elias has important family
responsibilities in Brazil.  A downward variance is warranted
as a result of that fact.  I understand that Mr. Elias is
expected to be deported following his term of incarceration.
That fact and the prospect of immigration detention following
his term of incarceration also contributes to my decision to
vary downward here.  I also recognize that he has no prior
criminal history.  And, as I noted before, the defendant's
health, educational, and job history have weighed in favor of a
lesser incarceratory sentence here.

        I have considered the defendant's arguments regarding
his asserted cooperation with the United States by his offer to

provide information about his co-conspirator.  I have

considered them, and I appreciate and understand the nature of

this task that Mr. Elias undertook in order to provide that

information.  While I have considered those facts, I have given

them very little weight.

        Mr. Elias did not provide information regarding crimes

unknown to the United States.  He provided information that, if

credited, would enhance the culpability of his co-defendant

with respect to the crimes for which Mr. Elias has already

taken responsibility.  I should note that I have the same view

regarding this issue if the version of events that Mr. Elias

describes is true as if they were not, which is why those are

issues that the Court is not considering in connection with the

sentencing and is not affecting sentencing here.

        I do look, however, to the nature of the steps that he

undertook in order to provide information to the United States.

As counsel has argued frequently, cooperation is a signal of

remorse and rehabilitation.  It may be that Mr. Elias provided

information regarding his co-conspirator for purely positive

motivations signaling remorse and rehabilitation, to unburden

himself in a pure drive for the truth, but he may too have been

motivated by more sordid motives, namely, to avenge himself for

the cooperation provided and by trying to enhance the sentence

imposed on the cooperating co-conspirator.

        So it is less clear in this circumstance, given the

nature of the information, that the conduct by Mr. Elias

reflects remorse and rehabilitation as opposed to other

motivations.  For those reasons the argument has been

considered by the Court in sentencing, but I have accorded it

little weight.  I note again that this is my view regardless of

the truth of the statements made by Mr. Elias.  Those are not

facts that I take into account in sentencing.

Similarly, I have considered defendant's argument that

the Court take into account the possible disparity between the

placement of Mr. Elias, a white collar criminal from abroad,

and a white collar criminal from the United States.  I accord

that some but very little weight.  It has contributed in only a

very small way to my decision to vary downward here, but I have

considered the argument.

what I have not considered is the fact of Mr. Elias's

identity theft sentence which is mandated by statute.

Disregarding that sentence, as I must, I cannot conclude that a

sentence of less than 18 months is appropriate for the type of

offense that was committed by Mr. Elias that is the subject of

Count One.

I have considered the need to avoid unwarranted

sentence disparities.

Having considered all of the 3553(a) factors and

purposes of sentencing set out in the statute,  I believe that

this sentence is appropriate for the defendant under these

1   circumstances.

2           I have considered the need to provide restitution to

3   any victims of the offense.  This factor weighs in favor of a

4   lesser sentence in this case.  And I have considered its effect

5   in determining the appropriate sentence for Mr. Elias.  That

6   factor has also contributed to my decision to vary downward

7   from the guidelines range with respect to Count One in this

8   case.

9           With that, Mr. Elias, can I ask you to please stand.

10  Thank you.

11          Mr. Elias, it is the judgment of this Court that you

12  will be sentenced to 18 months of imprisonment for Count One

13  and 24 months of imprisonment for Count Four, with each of

14  those terms to be served consecutively.

15          Following your term of imprisonment, I'm sentencing

16  you to a term of 2 years of supervised release for Count One

17  and 1 year of supervised release for Count Four, with those

18  terms to be served concurrently.

19          The mandatory conditions of supervised release shall

20  apply.  They are the defendant shall not commit another

21  federal, state, or local crime; the defendant shall not

22  illegally possess a controlled substance; the defendant shall

23  refrain from the unlawful use of a controlled substance; the

24  drug testing condition is suspended due to the Court's

25  determination that the defendant poses a low risk of future

36

1   substance abuse.

2           The defendant shall cooperate in the collection of DNA

3   as directed by the probation officer.

4           The standard conditions of supervised release 1

5   through 12 shall apply.  In addition, the following special

6   conditions shall apply.  The defendant shall submit his person,

7   residence, place of business, vehicle, and any property or

8   electronic devices under his control to a search on the basis

9   that the probation officer has reasonable suspicion that

10  contraband or evidence of a violation of the conditions of the

11  defendant's supervised release may be found.

12          The search must be conducted at a reasonable time and

13  in a reasonable manner.  Failure to submit to a search may be

14  grounds for revocation.  The defendant shall inform any other

15  residents that the premises may be subject to search pursuant

16  to this condition.

17          The defendant shall provide the probation officer with

18  access to any requested financial information.  The defendant

19  shall not incur new credit charges or open additional lines of

20  credit without the approval of the probation officer unless the

21  defendant is in compliance with the installment payment

22  schedule.  The defendant shall obey the immigration laws and

23  comply with the directives of immigration authorities.

24          The defendant shall be supervised in his district of

25  residence.

1        There will be no fine because the probation department

2   reports that you are unable to pay one.  The defendant must pay

3   to the United States a total special assessment of $100 for

4   each of the crimes of conviction, for a total of $200, which

5   shall be due immediately.

6        Counsel for the United States, I understand government

7   is not seeking forfeiture in this matter.  Is this correct?

8        MR. RAVI:  We are, your Honor.  There is a consent

9   preliminary order of forfeiture that was entered by Judge Swain

10  on February 4, 2019, ECF number 35.  I can hand that up to the

11  Court.

12       THE COURT:  Please do.

13       I have been handed the consent preliminary order of

14  forfeiture and money judgment which was executed by Judge Swain

15  on February 4, 2019.  It has been executed by, it appears, all

16  of the parties and counsel for defendant.  The document is on

17  the docket at docket number 35.

18       I will include in the final judgment forfeiture in the

19  amount set forth in the order entered by Judge Swain.  It

20  provides for forfeiture in the amount of $752,384.57.  I will,

21  again, order forfeiture as provided in the consent preliminary

22  order of forfeiture and money judgment as part of the judgment

23  in this matter.

24       I have also been handed a form order of restitution

25  which orders that the defendant pay restitution in the total

amount of $938,367.87 to the identified victim of the offense.

I understand that both of the parties have reviewed the order

of restitution and have no objection to it.  I'm entering the

order of restitution now, and I am ordering, by it and now

verbally, that the defendant pay restitution in the amount of

$938,367.87 to the victim that is identified.

          If the defendant is engaged in a BOP non-UNICOR work

program, the defendant shall pay $25 per quarter toward the

criminal financial penalties.  However, if the defendant

participates in the BOP's UNICOR work program as a grade 1

through 4, the defendant shall pay 50 percent of his monthly

UNICOR earnings toward the criminal financial penalties

consistent with BOP regulations currently at 28 CFR section

545.11.  Any payment that is not payment in full shall be

divided proportionately between the victims named.  In this

case there is only one.

          The remainder of restitution shall be paid in monthly

installments of at least 10 percent of the defendant's gross

monthly income over a period of supervision to be commenced 30

days after the date of the defendant's release from custody.

The defendant shall notify the United States Attorney for this

district within 30 days of any change of mailing or residence

address that occurs while any portion of the restitution

remains outstanding.

          Counsel, does either of you know of any legal reason

1   why the sentence shall not be imposed as stated?  Counsel for

2   the United States?

3           MR. RAVI:  No, your Honor.

4           MR. SNYDER:  No, your Honor.

5           THE COURT:  Thank you.

6           The sentence as stated is imposed.  I find that

7   sentence to be sufficient but not greater than necessary to

8   comply with the purposes of sentencing set forth in 18 U.S.C.

9   section 3553(a)(2).

10          Thank you very much, Mr. Elias.  You can be seated.

11          Mr. Elias, you have the right to appeal your

12  conviction and sentence except to whatever extent you may have

13  validly waived that right as part of your plea agreement.  The

14  notice of appeal must be filed within 14 days of the judgment

15  of conviction.  If you are not able to pay the costs of an

16  appeal, you may apply for leave to appeal in forma pauperis.

17  If you request, the clerk of court will prepare and file a

18  notice of appeal on your behalf.

19          Counsel, are there any other applications at this

20  time?

21          MR. RAVI:  Your Honor, at this time the government

22  moves to dismiss all open counts.

23          THE COURT:  Counsel for defendant, what is your

24  position on that request?

25          MR. SNYDER:  No objection, your Honor.

 1              THE COURT:  Thank you.  I am dismissing any and all

 2     open counts against the defendant.

 3              Any other applications?

 4              MR. SNYDER:  Yes, your Honor.  In light of the

 5     availability of direct flights from Sao Paolo to Newark and the

 6     driving distance from Newark to the Allenwood facility, if your

 7     Honor would think it appropriate, we would ask your Honor to

 8     make a recommendation to the BOP that the sentence that Mr.

 9     Elias serve be at the Low facility at the Allenwood detention

10     center.

11              THE COURT:  Thank you.  I'm happy to include a

12     recommendation that Mr. Elias be placed at Allenwood on the

13     basis of its proximity to Newark, which, as you proffered, has

14     many flights that are direct to Sao Paolo.  However, I am not

15     willing to include a recommendation that Mr. Elias be placed at

16     a particular security designation at that facility.  That is a

17     determination that will be made by the BOP and which the Court

18     has insufficient information to provide a meaningful

19     recommendation.

20              So, I'll be happy to include in the judgment a

21     recommendation that he designated to Allenwood, but I will not

22     include a recommendation that he be placed in the Low facility.

23     Does that change your request?

24              MR. SNYDER:  It doesn't, your Honor.  I apologize.  I

25     shouldn't have requested the facility designation as much as

1    just the facility itself.  But thank you, your Honor.

2             THE COURT:  Thank you.  I'm happy to include that in

3    the judgment.

4             Anything else before we adjourn?  Counsel for the

5    United States?

6             MR. RAVI:  No.  Thank you, your Honor.

7             THE COURT:  Thank you.

8             Counsel for defendant?

9             MR. SNYDER:  Nothing else for Mr. Elias, your Honor,

10   thank you.

11            THE COURT:  Thank you very much.  This proceeding is

12   adjourned.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25